# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MOHAMED AL-HAMMOURI,

     **Plaintiff,**

     v.

THE AMERICAN BOTTLING COMPANY, et al.,

     **Defendants.**

Case No. 2:18-CV-2099-JAR-KGG

## MEMORANDUM AND ORDER

Plaintiff Mohamed Al-Hammouri brings this action against his former employers, The American Bottling Company, Dr Pepper/Seven Up, Inc., and Dr Pepper Snapple Group for hostile work environment, discrimination, and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964[1] ("Title VII").  This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 69).  The matter is fully briefed, and the Court is prepared to rule.  As explained fully below, the motion is **granted in part and denied in part**.  Summary judgment is granted as to Plaintiff's discrimination claims related to his non-selection for leadership programs and his suspension without pay.  Summary judgment is denied as to all other claims, including Defendants' affirmative defense under *Faragher/Ellerth*.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[2]  In applying this standard, courts view the evidence and all reasonable inferences therefrom in the

---

[1] 42 U.S.C. § 2000e.

[2] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

light most favorable to the nonmoving party.[3]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[3] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[9] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[11]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[13] The nonmoving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[14]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[16]

## II.    Uncontroverted Facts

The following material facts are uncontroverted, stipulated to in the Pretrial Order,[17] stipulated to for the purposes of summary judgment, or viewed in the light most favorable to Plaintiff as the nonmoving party.  Plaintiff is a Muslim man.  He was born in Jordan and moved to the United States in June 2009.  He considers his race white.  Plaintiff began his employment in the Lenexa Branch of Defendant The American Bottling Company in October 2011 as a

---

[11] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[12] *Adams*, 233 F.3d at 1246.

[13] Fed. R. Civ. P. 56(c)(4).

[14] *Id.*; *see also Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[15] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[16] *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[17] Doc. 62.

Merchandiser. He was promoted to Relief Account Manager in January 2012, promoted to Account Manager in July 2012, and promoted to District Manager in late 2013. From late 2013 until the end of his employment, Plaintiff was supervised by Todd Lindhoff. Though Plaintiff was employed by The American Bottling Company during the period relevant to his claims, Defendants assume that Plaintiff was jointly employed by all three Defendants for purposes of their motion for summary judgment.[18] For purposes of this Memorandum and Order, the Court will also assume as such.

### A. Organizational Structure

At The American Bottling Company (hereinafter "Dr Pepper"), Merchandisers report to Merchandising Managers and Merchandising Managers report to Branch Managers. Dr Pepper also employs Relief Account Managers and Account Managers. Both of those positions report to District Managers who, like Merchandising Managers, report to a Branch Manager. Dr Pepper's Branch Managers report to Area Directors.

In 2012, Todd Roberts became the Area Director over the Lenexa Branch where Plaintiff worked. In late 2013, Lindhoff became the Branch Manager for Dr Pepper's Lenexa Branch. Soon thereafter, Plaintiff applied for and received a District Manager position. Lindhoff interviewed Plaintiff and ultimately chose him for the position. As a District Manager, Plaintiff reported to Lindhoff. District Managers typically work during regular business hours on Mondays through Fridays, but they are also expected to be available at other times as business requires.

---

[18] *See* Doc. 70 at 1 n.1.

## B.     Lindhoff's Treatment of Plaintiff

Soon after Plaintiff was promoted to District Manager, another District Manager, Lauren Slezak, was discharged.  During the first half of 2014, Slezak asked Plaintiff to assist her with getting her personal belongings because Lindhoff had not responded to her calls or emails. Plaintiff spoke to Lindhoff about the matter, explaining that he had run into Slezak at the grocery store.  Lindhoff responded angrily and told Plaintiff to worry about his own job and not get involved with previous employees.

After this incident, Plaintiff complained to Human Resources ("HR") Manager Rachel Zuniga about Lindhoff's behavior.  Plaintiff told Zuniga about the incident concerning Slezak. Plaintiff also recalls telling Zuniga that Lindhoff: (1) called Plaintiff while Plaintiff was on vacation telling him to be worried about his job, (2) frequently told Plaintiff he should be worried about his job, (3) talked "weird" to Plaintiff compared to others, and (4) frequently yelled at Plaintiff about business issues, often in front of others.  Plaintiff does not remember whether he explicitly told Zuniga he thought Lindhoff's treatment was due to his race, national origin, or religion.  Zuniga informed Plaintiff she would investigate and get back to him.  A few hours later, Lindhoff asked Plaintiff if he had been to HR.  Plaintiff confirmed he had, and Lindhoff asked Plaintiff if he thought going to HR would do anything to Lindhoff.  Lindhoff also told Plaintiff to come to him in the future before going to HR.  Plaintiff did not tell anyone about this conversation with Lindhoff and did not have further conversation with Zuniga about the issue.

In the fall of 2014, when Plaintiff and Lindhoff were riding to a business location together, Lindhoff began recounting the newsworthy events that had recently taken place in Ferguson, Missouri.  Lindhoff commented, in Plaintiff's words, "I don't know where's [sic] our

country heading. We got so many issue [sic], terrorist[s] blowing themselves and thiefs [sic] they get killed and they pretend they're innocent, and I don't know where's [sic] this country heading."[19]

On one occasion, Lindhoff asked Plaintiff to go with him to help him find his dog because the dog had escaped from Lindhoff's garage that morning. He asked Plaintiff to try to catch the dog because Lindhoff stated he was unable to run. Another time, Lindhoff directed Plaintiff to take him to look for a coffee machine for his wife. In another instance, Lindhoff asked Plaintiff to drive him to drop off his laundry. These incidents all occurred during Plaintiff's normal work hours.

Plaintiff saw Lindhoff's administrative assistant at a casino on two occasions. Jamie Malbon, another Dr Pepper employee, joked one time about Plaintiff dating the administrative assistant because the administrative assistant mentioned she ran into Plaintiff at the casino. Following this, Lindhoff repeatedly joked about Plaintiff dating the administrative assistant and Plaintiff frequenting the casino.

On August 26, 2014, Malbon called Lindhoff on a speakerphone to tease Lindhoff. Plaintiff was in the room with Malbon at the time. Malbon mentioned Plaintiff by name during the conversation. While still on the speakerphone but unaware that Plaintiff was present in the room with Malbon, Lindhoff said, "I'm just done with this guy, I can't understand a fucking word out of him. And I'm just done with this guy. He talked to me, man, I just don't understand him."[20] Malbon quickly hung up the call and apologized to Plaintiff for Lindhoff's comments. Later that day, Lindhoff left Plaintiff two voicemails. He left the first voicemail at 7:56 p.m. and

---

[19] Doc. 70-2 at 193:2–11.

[20] *Id.* at 144:1–6.

said, "Hey, when you get out of the casino, give me a call. See ya."[21] He left a second voicemail at 8:17 p.m. and said:

> Hey, I like your language. I like your message I should say. But going forward, send it to me. Let me help you with your English because the direction is there, I get it. I understand it. Let me help you with your English to get it to a better place. Alright? So, forward it to me from now on single-handedly and then I'll send it back to you and you can forward it on to everyone else after I help you fix it.[22]

In October 2014, Plaintiff attended a work-related training in Iowa. One of the employees attending the training with Plaintiff was Randy Hall, whom Lindhoff knew. While Plaintiff was in Iowa, Lindhoff sent Plaintiff a text message stating: "Tell Hall he is a fruity ass puss boy. Do it!"[23] Plaintiff understood Lindhoff was trying to joke around with Hall, but Plaintiff does not talk that way, and—according to Plaintiff—Lindhoff should have known that.

On November 26, 2014, Plaintiff sent Lindhoff a text wishing him and his family a happy Thanksgiving. Lindhoff responded: "Christopher Columbus Indeed. Discover America."[24] Plaintiff testified that he was not sure what Lindhoff meant by this text.

On July 2, 2015, Plaintiff wished Lindhoff a happy Fourth of July, and Lindhoff responded by saying, "You need to learn about America first before you tell me Happy Fourth of July."[25] Plaintiff does not believe that there were any witnesses to this incident. Lindhoff does not recall making this comment.

---

[21] Doc. 70-2 at 147; Doc. 70-15.

[22] Doc. 70-2 at 144:14–145:5; Doc. 70-17.

[23] Doc. 70-2 at 150:17–25; Doc. 70-18.

[24] Doc. 70-20.

[25] Doc. 70-2 at 178:4–179:16.

During Ramadan one year, a group of employees ordered pizza at a team meeting. Plaintiff was not eating, and Lindhoff remarked, "Yeah he's fasting, this guy, they're Muslim, they're weird. I don't know what they do there."[26] On another occasion, Lindhoff remarked that employees conducting an event with Plaintiff would not get to eat lunch because Plaintiff was fasting.

Sometime in 2015, Plaintiff won tickets to a suite at a Royals game through Dr Pepper. Plaintiff and his family attended the game. Lindhoff was also present. When Plaintiff, his wife, and their four kids arrived, Lindhoff asked Plaintiff, "Is this only your [sic] 12 kids, or you got more?"[27] When Plaintiff's wife tried to shake Lindhoff's hand or greet him, Lindhoff turned around and walked away. Later, Lindhoff asked Plaintiff's wife if she was Muslim. Plaintiff's wife said she was, and Lindhoff told her he thought Muslim women wore "rags" on their heads. Plaintiff did not witness this event but learned about it from his wife. Plaintiff felt that Lindhoff ignored him and his family at the event and witnessed Lindhoff being social with other employees.

In December 2015, Plaintiff sent an email to some of his coworkers wishing them Happy Holidays. At a subsequent meeting, Lindhoff asked Plaintiff what the email was about. Plaintiff explained that he had sent a "Happy Holidays" email. Warehouse Manager Mike Langdon then thanked Plaintiff for the holiday greeting and wished Plaintiff and his family the best. Lindhoff replied to Langdon, "[H]e's Muslim, why did you respond to him? Muslims do not celebrate our holidays."[28]

---

[26] *Id.* at 181:10–21.

[27] *Id.* at 184:11–14.

[28] *Id.*

That same month, Lindhoff called Plaintiff to ask him to meet him at a bar when Plaintiff was driving home from work. When Plaintiff arrived, Lindhoff asked if Plaintiff had watched the news. Plaintiff responded that he had not. Lindhoff began recounting the shooting in San Bernardino that had happened recently. Lindhoff asked Plaintiff what the shooters, who were Middle Eastern, had been thinking. Plaintiff told Lindhoff he did not know. Lindhoff continued to ask Plaintiff about the shooters' mental states and motivation. Plaintiff insisted he did not know the answer and did not know what Lindhoff was talking about. Lindhoff then commented that he believed Plaintiff had been acting weird lately. Lindhoff said he wanted to see what was going on. Plaintiff asked Lindhoff what he meant, and Lindhoff explained that he did not know but wanted to "chitchat" with Plaintiff for a little bit.[29] Plaintiff then asked if the two were done and left the bar.

In March 2016, Plaintiff was getting ready to go to Dubai for vacation and had not shaved his facial hair. The morning of Plaintiff's flight, he decided to go into work. While there, Lindhoff gave Plaintiff an assignment and told Plaintiff he could not leave until it was complete. Plaintiff reminded him that he was going on vacation and indicated he would not finish the assignment before leaving. That same day, Lindhoff asked, "What's this?" referencing Plaintiff's facial hair.[30] Plaintiff said he had not shaved, to which Lindhoff replied, "I don't know what you guys do in your country, but make sure you don't come back before you shave it."[31] Dr Pepper did not have a policy against facial hair, although men in the beverage industry traditionally are clean-shaven.

---

[29] Doc. 70-2 at 192:1–11.

[30] *Id.* at 200:6–13.

[31] *Id.* at 200:14–16.

In April 2016, Plaintiff attended a class called "Managing within the Law," taught by Regional HR Manager Lucas Gray.[32]  During the class, Gray explained that employees should raise concerns about harassment or discrimination if they have them.  After the class, Plaintiff approached Gray and informed him that he believed Lindhoff was discriminating against him.  Gray told Plaintiff they should set a time to talk about Plaintiff's concerns.  Gray subsequently sent Plaintiff an email.  The two had a conversation on May 2, 2016.

After their conversation, Gray sent Plaintiff a copy of his notes via email.  Plaintiff made a change to one of the dates in Gray's notes, but otherwise told Gray that his notes were accurate.  Because Gray's notes were a summary, they did not include a complete list of every detail Plaintiff recounted to Gray.  Plaintiff also recalls telling Gray during the meeting that he could not remember every infraction because "it's just a small word here."[33]  Gray's notes mention the following incidents: (1) Malbon calling Lindhoff on the speakerphone in August 2014, (2) Lindhoff telling Plaintiff he needed to learn about America before wishing him a Happy Fourth of July, (3) Lindhoff remarking that other employees should not have responded to Plaintiff's "Happy Holidays" email because Plaintiff is Muslim and Muslims do not celebrate "our holidays," (4) Lindhoff's comments about Plaintiff's facial hair, and (5) Lindhoff telling Plaintiff he could not wear jeans at work even though others were allowed to.  Plaintiff recalls also mentioning Lindhoff's comments about fasting during Ramadan and Lindhoff calling Muslims "weird."  According to Plaintiff, the "comment about shaving is the one that really bother[ed]

<hr />

[32] Gray had received training prior to becoming Regional HR Manager.  That training laid out the following process for addressing allegations of harassment or discrimination: (1) obtain detailed information from the employee complaining of harassment and/or discrimination, (2) speak to the harasser about the allegations, and (3) if the complainant and harasser had different stories, speak to witnesses.

[33] Doc. 70-2 at 181:10–19.

[him]."[34]  Plaintiff also told Gray he believed that Lindhoff made comments without considering that the comments may hurt people's feelings.  Plaintiff did not identify witnesses to the Fourth-of-July incident, but did identify witnesses to each of the other events.  At the end of the meeting, Gray asked Plaintiff how he would like the matter resolved.  Plaintiff explained he did not want to hurt anyone because he feared that Lindhoff would try to get rid of him if he did.  Plaintiff suggested that HR could give a training about treating employees with respect.

Two days after his conversation with Plaintiff, Gray interviewed Lindhoff.  Lindhoff denied Plaintiff's allegations that he told Plaintiff he needed to learn about America before he could wish Lindhoff a happy Fourth of July.  Lindhoff admitted that he had made comments about Plaintiff's language, Plaintiff's facial hair, and Plaintiff's holiday email.  Lindhoff, however, provided alternate explanations.  Lindhoff told Gray that he and Plaintiff joked back and forth and had friendly banter.  Lindhoff stated that he believed he taught Plaintiff about aspects of U.S. culture.[35]  Plaintiff never told Gray that he interpreted Lindhoff's comments to be jokes, friendly banter, or helpful lessons about U.S. culture.

Gray determined that no further investigation was warranted; Gray did not interview any of the witnesses that Plaintiff had identified.  Gray did, however, have a conversation with Lindhoff about his actions, explaining that they were not appropriate.  Gray informed Lindhoff's managers of that meeting and suggested they document the meeting.  Roberts, one of Lindhoff's managers, concluded that the verbal warning was sufficient and decided not to include a written record of the warning in Lindhoff's file.  According to Plaintiff, after the conversations with Gray, Lindhoff became more dismissive of him.  For instance, Plaintiff recalled that Lindhoff

---

[34] Doc. 70-23 at 6.

[35] Lindhoff provided the example that he taught Plaintiff about "marriage in America."

refused to answer some of his business-related questions following Lindhoff's conversation with Gray.

In August 2016, three months after his conversation with Gray, Plaintiff received his mid-year review from Lindhoff. Lindhoff rated Plaintiff a 4 on a scale of 5 and included many positive comments.[36] Lindhoff also selected Plaintiff to attend market visits when upper management came to town, giving Plaintiff exposure to upper management. According to Joseph Rowland, the Business Unit General Manager, Plaintiff had been selected because "he was identified as [a] strong performer, and people always want to put their best people in front of [him]."[37]

At some point during his employment, Lindhoff asked Plaintiff to handle an issue between an employee from Pakistan and a customer from India. The account was not located in Plaintiff's area of responsibility, and Plaintiff's job duties did not include resolving employee-customer disputes. Lindhoff asked Plaintiff to tell him about how Indian and Pakistani cultures work together, and how Middle Eastern people communicate.

On another occasion, Lindhoff asked Plaintiff if he knew Lindhoff's doctor. Plaintiff stated that he did because they played soccer together, and Lindhoff replied that they looked like each other. When Plaintiff asked if it was because they were both short men, Lindhoff responded that it was because both Plaintiff and Lindhoff's doctor were Middle Eastern.

Lindhoff also misspelled Plaintiff's name in group texts or emails as "Months" at least three times. Plaintiff explained that Lindhoff could call him Mohamed or Mo. Lindhoff

---

[36] Doc. 70-26.

[37] Doc. 70-27 at 84:2–6.

explained that "Mo" had auto-corrected to "months."  Lindhoff also called Plaintiff "Mo Mo" despite Plaintiff's requests that he either use Mohamed or Mo.

On at least two occasions, Lindhoff asked Plaintiff if he would be sacrificing goats over the weekend.  A now-former-employee, Thomas Van Anne, recalled hearing these comments.

### C.     Lindhoff's Behavior Directed at Employees Other Than Plaintiff

On at least one occasion, Lindhoff referred to Dr Pepper as the "black guys of the beverage industry."[38]  He made this comment when he was upset with the Lenexa Branch's performance.  Additionally, one employee recalled a situation during which a Middle Eastern employee was talking about his upcoming travel plans.  Lindhoff remarked that he hoped the employee did not get caught up in T.S.A.

During Plaintiff's employment, a man named Kelly Allen was hired to work at Dr Pepper as an Account Manager.  Allen is African-American who, at the time he worked at Dr Pepper, had an afro and wore a sweatband on his head.  Lindhoff knew Allen because Allen previously worked at a bar that Lindhoff frequented.  When Allen started his job at Dr Pepper, Lindhoff introduced him to other employees as "Coffee Black," referring to a character in a popular film who also had an afro and wore a sweatband.

### D.     Lindhoff's Texting and Calling Habits

Lindhoff texted Plaintiff after regular business hours on multiple occasions.  In 2014, Lindhoff texted Plaintiff after hours on at least six occasions.[39]  In 2016, Lindhoff texted Plaintiff after hours on at least seven occasions.[40]  Additionally, on April 11, 2017, Lindhoff sent Plaintiff a text around 10:00 p.m. that said, "T [Lindhoff's wife] mad at me.  Nothing else going on.  How

---

[38] Doc. 78-17 at 48:5–23.

[39] Doc. 70-2 at 139–40, 150, 157–58.

[40] Doc. 70-13.

you doing Mo?"[41]  Lindhoff then texted, "I might have to move in with you."[42]  Plaintiff did not

respond.  Plaintiff did not believe these were friendly texts because it made him uncomfortable to

receive a message from his supervisor at 10:00 p.m. requesting to move in with him.

Lindhoff also texted three other District Managers that reported to him who were white,

American-born, and non-Muslim: Bryan Rouchka, Mike Langdon, and Scott Johnson.  Lindhoff

texted Rouchka between five and six at night but did not call or text him late at night.  Lindhoff

did not text or call Langdon outside normal business hours.  S. Johnson testified that he received

texts and calls from Lindhoff after regular business hours.[43]  S. Johnson did not recall whether he

received texts or calls from Lindhoff after 9:00 p.m.

S. Johnson ultimately quit his job at Dr Pepper.  He explained that he quit because he had

enough of "working in chaos every day, departments not working together, being called by stores

on weekends and late at night and having to work on [his] day off and not get paid[.]"[44]  S.

Johnson stated he did not know what Lindhoff expected of him and that Lindhoff yelled at him

in front of his coworkers, both of which were factors that contributed to S. Johnson quitting.

### E.      Plaintiff's Reviews and Attempts to Change Positions within Dr Pepper

Lindhoff conducted performance reviews of Plaintiff twice a year.  The reviews typically

took place in March and August.  By way of example, Lindhoff rated Plaintiff a "4" on a scale

from one to five in March 2015.  He included positive comments about Plaintiff, including that

he was "a key leader among his peers."[45]

---

[41] Doc. 70-30 at 2.

[42] *Id.*

[43] Doc. 70-32 at 9–10.

[44] Doc. 70-35 at 21:16–22:1.

[45] Doc. 70-18.

In October 2016, Plaintiff applied for a Branch Manager position at Royal Crown Bottling Corporation ("RC Bottling") in Marion, Illinois. At the time, Plaintiff's annual salary at Dr Pepper was $57,325.52; he was also eligible for incentive compensation and bonuses, which typically amounted to $5,000 per year. On March 31, 2017, Plaintiff received an offer to be the Branch Sales Manager at RC Bottling, which came with an annual base salary of $57,000.32, bonus potential of $12,000 per year, comparable benefits, a company car, and relocation expenses. Plaintiff requested additional compensation from RC Bottling, and RC Bottling increased the base salary offer to $60,000.20. Plaintiff testified that this offer was better than his job at Dr Pepper in terms of "[m]oney and everything else."[46]

Plaintiff showed the RC Bottling offer letter to Lindhoff, explaining that he had applied for many promotions at Dr Pepper but did not feel he would ever be promoted. Lindhoff responded that Dr Pepper would have many job openings and that Plaintiff should be patient, but it was Plaintiff's decision whether to leave Dr Pepper. Following this conversation, Plaintiff declined the RC Bottling job offer.

During his employment with Dr Pepper, Plaintiff applied for at least six positions outside Lindhoff's supervision but did not receive an offer for any of the positions.[47] Dr Pepper's protocol is for hiring managers to contact the current supervisor of any internal applicant. Lindhoff does not recall providing any negative information about Plaintiff. In addition, Lindhoff authored several positive performance reviews of Plaintiff, which hiring managers may have considered during the process.

---

[46] Doc. 70-2 at 26:10–13.

[47] Defendant notes that Plaintiff applied for four positions that were ultimately filled, but does not count positions that were not filled, filled after Plaintiff's employment, or his leadership program applications in their total. Doc. 70 ¶ 132 n.7.

In May 2016, Plaintiff applied for a Branch Manager position under Roberts' supervision. Roberts explained that he was forced to hire another individual for the position, because that individual had completed a leadership program and Roberts was strongly encouraged to hire the other applicant.

Plaintiff spoke with Jason Smith, an Area Director in Houston, about wanting to change locations and had two interviews with him. Smith informed Plaintiff that his name was "always [at]the top of the list," but that he could not hire him.[48] While he did not elaborate as to why he could not hire Plaintiff, Smith offered to meet with Lindhoff and create a development plan for Plaintiff. Plaintiff also spoke with his mentor, Rich Brennan, about his desire to leave the Lenexa Branch because he did not see a future at the location. Brennan indicated he would do some research and assist Plaintiff if possible. Doug Wilcox, a hiring manager with whom Plaintiff spoke, instructed Plaintiff to talk to Lindhoff who could create and implement a development plan for Plaintiff.

In December 2016, Plaintiff inquired about participating in a leadership program to increase his odds of receiving a promotion or new position. Jamie England, who oversaw the leadership program, explained two leadership programs to Plaintiff: the Emerging Leader Program ("ELP"), which was for people who needed to learn more about Dr Pepper's business, and the Business Leader Development Program ("BLD Program"), which targeted internal applicants with high potential. England explained that only a "very small group [is] selected from a large population" to participate in these programs.[49] She also told Plaintiff that he was "very well respected by the business and [had] great potential."[50]

---

[48] Doc. 70-2 at 279:14–208:9.

[49] Doc. 70-39 at 2.

[50] *Id.*

Per England's recommendation, Plaintiff spoke with his local HR Manager, Thomas Johnson, about applying for one of the leadership programs. Plaintiff also spoke with Roberts and Lindhoff about the programs. Lindhoff recalls talking to Roberts about Plaintiff applying for a leadership program, but Lindhoff testified he does not know what happened afterward. T. Johnson sent Plaintiff a follow-up email and recommended additional steps Plaintiff could take, including information about a training book and classes.[51] Plaintiff had already completed the classes, and had read most of the training book prior to receiving the recommendation. T. Johnson, Roberts, and Lindhoff scheduled monthly meetings with Plaintiff to check in with his progress. Plaintiff was dissatisfied with these meetings because he believed T. Johnson, Roberts, and Lindhoff were just going through the motions. Plaintiff also noted that the three did not all show up to every meeting.

Rowland made the ultimate decision as to which people from his geographical region of Dr Pepper would be part of the BLD Program. Rowland's position was three levels above Lindhoff; Lindhoff reported to Roberts, Roberts reported to Don Henson, and Henson reported to Rowland. Rowland knew Plaintiff and thought highly of him because the two interacted during Rowland's visits to the Lenexa Branch. Although Rowland testified that Plaintiff was not a good candidate for the ELP because Plaintiff already had sufficient knowledge of Dr Pepper's business, Rowland believed that Plaintiff was a good candidate for the BLD Program. Rowland suggested Plaintiff look into the BLD Program and frequently discussed Plaintiff's interest in the BLD Program with him.[52] Rowland does not know for certain whether Plaintiff's name was

---

[51] Doc. 70-41.

[52] Doc. 70-27 at 55:15–56:16.

provided to him for consideration in the BLD Program in 2017; however, Rowland testified that he would not have chosen Plaintiff over those he ultimately selected for the BLD Program.

After Plaintiff spoke to Rowland about moving up in the company during one of Rowland's visits to the Lenexa Branch, Lindhoff told Plaintiff that Rowland could not move Plaintiff up in the company because Plaintiff was not "going to go anywhere without [Lindhoff's] approval."[53]  Lindhoff also told Plaintiff he should not ask Rowland for jobs or to move elsewhere within Dr Pepper.

### F.      The Runzheimer Application

During Plaintiff's employment, Dr Pepper began using a software application called "Runzheimer" for certain classifications of employees to submit business miles for reimbursement.  Dr Pepper first introduced the Runzheimer application to District Managers in the Lenexa Branch in late 2015, but employees were provided minimal training on how to use it. Plaintiff received a written copy of the policy on how to use Runzheimer, but employees orally received information that contradicted or deviated from the written policy.

Dr Pepper did not mandate a procedure for running the application.  Runzheimer users could either manually record each trip through Runzheimer or they could set Runzheimer to automatically record all miles during certain hours of specified days.  Plaintiff set his Runzheimer application to track all miles he drove between 6 a.m. and 6 p.m. on Mondays through Fridays.  If Plaintiff worked weekends or additional hours, Plaintiff tracked his miles manually.

Dr Pepper also did not maintain a consistent policy about which miles would be reimbursed.  For instance, when Dr Pepper first implemented Runzheimer, employees were

---

[53] Doc. 70-2 at 194:2–196:14.

instructed that "commute miles"—explained in the policy as "home to office/first stop and office/last stop to home"—should not be submitted for reimbursement.[54]  Based on the Runzheimer training, Plaintiff believed that Runzheimer automatically detected and excluded commute miles from being tracked.  Sometime later, Roberts told the employees that they should capture "commute miles" as business miles.  Plaintiff found the application confusing and did not make it a priority to determine whether he was being reimbursed for his commute miles.

Similarly, there was not a consistent policy regarding whether miles to-and-from lunch should be submitted for reimbursement.  During his deposition, Rowland explained that a District Manager "going to lunch during the normal course of their day, within the area that they're doing business" would not need to remove those miles off his or her mileage off report.[55]  Rowland added that if a District Manager were to "drive to Timbuktu" for lunch, he or she should manually remove those miles from the mileage report.[56]  Jon LeRoy, a manager within Dr Pepper's Asset Protection & Security Group, testified that in addition to reasonable lunch miles, it was generally not a problem if an employee left miles on his/her mileage report for personal errands that were within their territory on the way to or from an account visit.

Employees who used Runzheimer submitted their mileage reports on or before the third day of each month.  Prior to submission, each employee was instructed to review his or her mileage report to ensure sure the trips were all business-related.  If employees identified personal trips, they were responsible for removing them from the mileage report before submission.  Plaintiff does not recall reviewing all his miles, but he did manually turn off his Runzheimer application before taking personal trips and turned it back on once the personal trip concluded.

---

[54] Doc. 70-42 at 8.

[55] Doc. 78-18 at 25:15–25.

[56] *Id.*

### G.    Investigation of Plaintiff's Mileage Reimbursement

In the fall of 2017, Roberts and Lindhoff attended an event at one of Plaintiff's accounts. During that event, Roberts was not satisfied with a display of Dr Pepper's product, believing the display was not up to company standards. Roberts spoke to Lindhoff about his concerns, asking Lindhoff where Plaintiff spent his time because it appeared to Roberts that Plaintiff had not spent time servicing that account.

A short time later, Lindhoff was explaining to a newly hired District Manager, Mike Bennett, that he could use Runzheimer reports to review where his subordinates had been working. It occurred to Lindhoff that he could use this method to review Plaintiff's whereabouts. Lindhoff accessed Plaintiff's Runzheimer report for October 2017 and noticed multiple trips that did not appear to have a business purpose. Lindhoff noted Plaintiff's report listed multiple stops at what appeared to be residential addresses nearly every day.

Based on his cursory review of Plaintiff's October 2017 Runzheimer report, Lindhoff raised his concerns with T. Johnson. T. Johnson and/or Lindhoff contacted LeRoy and asked him to review the Runzheimer mileage reports Plaintiff had submitted for reimbursement. LeRoy's duties include investigating mileage fraud. He estimated that he personally conducted between ten and fifteen such investigations since Dr Pepper began using Runzheimer. He estimated that the remainder of his team conducted between twenty and twenty-five such investigations during the same timeframe. Investigations were typically started because "a manager or someone up the chain sees an anomaly in the" mileage during the course of "routine managerial duties[.]"[57] LeRoy testified that employees submitting miles for lunch trips or

---

[57] Doc. 70-49 at 6.

errands that were on the route to or from an account were "not generally a problem."[58] Rowland confirmed that employees were permitted to submit mileage for lunch trips if the lunch location was near one of their accounts or within their territory.

When the investigation was referred to LeRoy, the referrer expressed concern that Plaintiff had engaged in fraud.[59] In an email to LeRoy dated Friday, November 10, 2017, T. Johnson flagged "some questionable stops . . . that are not in [Plaintiff's] area and not in locations that [Dr Pepper] would service," and "a lot of residential locations" on Plaintiff's mileage report.[60] The following week, LeRoy, T. Johnson, and Lindhoff had a conference call so that LeRoy could obtain further information. Lindhoff sent LeRoy a series of emails following that conversation, including a map of some, but not all, of Plaintiff's area of responsibility. LeRoy explained that although a map is helpful in his investigations, he does not rely solely on the map of an employee's territory to identify suspicious mileage submissions. Instead, LeRoy focuses on identifying addresses with no apparent business-related purpose and addresses that require further information to determine whether they were legitimately submitted for reimbursement.

During the early stages of his investigation, LeRoy flagged some addresses that seemed questionable. LeRoy and Lindhoff exchanged emails wherein LeRoy asked questions about specific locations on Plaintiff's report. Lindhoff provided explanations for some of the stops. For instance, Lindhoff confirmed that Plaintiff had assisted other District Managers and serviced accounts outside of Plaintiff's territory to do so. LeRoy also inquired about the Saturday trips on

---

[58] Doc. 78-19 at 5.

[59] The record is unclear whether the referrer in this instance was T. Johnson or Lindhoff.

[60] *Id.* at 8.

Plaintiff's report, to which Lindhoff responded that Plaintiff occasionally worked Saturdays.[61] Even after conferring with Lindhoff, LeRoy had questions about certain locations Plaintiff had visited because the addresses were residential or did not have any apparent link to a Dr Pepper business account. LeRoy testified that Plaintiff's Runzheimer reports raised "some concerns, but not quite the volume [LeRoy] was expecting" based on how the information had initially been presented to him.[62]

At the end of his review, LeRoy decided he needed to speak with Plaintiff to give him an opportunity to explain the suspected illegitimate mileage submissions. Plaintiff was asked to attend a meeting on November 27, 2017, without being told purpose of the meeting, which was LeRoy's typical practice. Plaintiff, Lindhoff, and T. Johnson all attended the meeting and LeRoy participated telephonically. LeRoy explained his role within Dr Pepper, then said that Plaintiff's mileage submissions had been brought to his attention for further investigation. LeRoy added that he wanted to clarify certain locations on the mileage reports with Plaintiff. LeRoy and T. Johnson asked Plaintiff about different addresses he had visited in June and July of 2017. Plaintiff stated he could not recall what locations those addresses corresponded with. They also asked Plaintiff about his work as an Uber Driver. Plaintiff responded that he only worked as an Uber Driver on nights and weekends, and that he was willing to provide documentation to that effect. LeRoy or T. Johnson then asked Plaintiff to step out of the room. Plaintiff complied.

When Plaintiff returned, he was asked about "Amazon" and the Amazon-related addresses on his mileage report.[63] Plaintiff admitted to visiting those addresses but also stated

---

[61] Doc. 70-51.

[62] Doc. 70-49 at 13.

[63] The parties, at times, are unclear about what "Amazon" refers to. In his deposition, Plaintiff used "Amazon" to refer to his employment with Securitas and XPO Logistics, who contract with Amazon. Regardless of

Lindhoff had given him permission to do so. Lindhoff confirmed that he had permitted Plaintiff to go to the Amazon-related addresses but clarified that he did not tell Plaintiff to submit mileage reimbursement for the trips.

In total, Plaintiff's September and October 2017 Runzheimer reports show that Plaintiff submitted mileage for trips to his wife's workplace at Avatar Engineering on at least twenty-four occasions. Plaintiff told Lindhoff, T. Johnson, and LeRoy that he visited his wife's work to have lunch with her, and that he understood lunch mileage did not need to be removed. Plaintiff's wife worked approximately 1.5 miles from Dr Pepper. Plaintiff also submitted mileage for trips to and from his inlaws' residence but did not provide any explanation as to why. Plaintiff submitted mileage reports containing trips to a business called Wonder Tots, presumably his children's daycare, twenty times during the two-month span and could not explain why he submitted those miles for reimbursement during the meeting. All three of these locations were within Plaintiff's territory. The Runzheimer report for September also contained a trip to 833 Ward Parkway and three trips to a location in Gardner, Kansas. Plaintiff admitted that those four trips were for an interview and subsequent orientation and training for a job with a different employer.

Plaintiff was told he could return to work for the remainder of the day on November 27, 2017. Plaintiff stated that he would prefer to use some of his accrued vacation time and go home for the day. He was given permission to do so. Before leaving, Plaintiff was asked to produce a written statement about his visits to the Amazon addresses. Plaintiff agreed, and wrote: "I admit that on 9/11/2017- 9/12/2017 [and] 9/13/17 on these days without noties [sic] that my Runzimer

---

the specific employer, the Court will use "Amazon" to refer to Plaintiff's additional employer between September 11, 2017 and September 13, 2017.

app was working and I was interviewing with XPO [an Amazon company] and been to orientation but didn't work on my schedule so I quiet [sic]."[64]  Plaintiff agrees that the mileage he incurred for his travel to and from the Amazon addresses were not business expenses for which he should have sought reimbursement.

After Plaintiff left the November 27 meeting, T. Johnson and Lindhoff decided to suspend Plaintiff because they wanted to compare Plaintiff's Runzheimer reports to those of other District Managers and then decide how to proceed.  Lindhoff sent Plaintiff a text asking him to return to the office.  Plaintiff returned and was informed he would be suspended without pay.  Plaintiff orally resigned.  Three days later, Plaintiff sent an email to Lindhoff and T. Johnson to confirm his resignation, stating in part:

> While I have for the most part been satisfied with my time at [Dr Pepper], I feel that the situation has become somewhat untenable and it is now time to move on.  However, I leave feeling satisfied with the standards of my work and behavior, and would like to thank you for the learning opportunity that I enjoyed during my time here.[65]

Plaintiff testified that he and his wife drafted the email together based on a resignation letter template they found online.

LeRoy completed the investigation in Plaintiff's mileage reports and noted a loss of $62.00.  LeRoy explained that this amount reflects conservative estimates based only on what he could confirm had been improperly submitted mileage.  LeRoy also testified that he did not spend extensive time reviewing Plaintiff's entire history of Runzheimer reports following the November 27 meeting because Plaintiff had resigned.

---

[64] Doc. 70-52 at 2.

[65] Doc. 70-54 at 2.

### H.      Other Employees' Use of the Runzheimer Application

After the investigation of Plaintiff's Runzheimer use, T. Johnson directed LeRoy to review the mileage reports of other District Managers under Lindhoff.  LeRoy instructed Don Creekmore, another investigator, to review Rouchka's and S. Johnson's Runzheimer reports. Creekmore determined nothing unusual stood out to him and reported as such to LeRoy.  LeRoy then reviewed the reports on his own and confirmed that neither review warranted an investigation.  Lindhoff did not follow up on LeRoy's review of these Runzheimer reports. LeRoy was not aware of other employees under Lindhoff's supervision who had been investigated for Runzheimer use.  Rouchka explained that he typically did not delete mileage for lunch if it was on the route he was taking to a customer or if it was a low-mileage trip.  S. Johnson stated that he was not sure if he turned off his Runzheimer when he went to lunch.  Both Rouchka and S. Johnson admitted that they may have made mistakes in their Runzheimer submissions, but neither was subject to an investigation, nor were they suspended without pay during the initial review of their mileage reports.

Lindhoff also used Runzheimer to submit business miles for reimbursement.  During his deposition on October 22, 2018, Lindhoff could not provide the business purpose for a few trips from 2017.  As a result, Defendants investigated Lindhoff's mileage reimbursements in late 2018.  That investigation concluded that Lindhoff had submitted personal mileage for reimbursement which should have been omitted.  Lindhoff was not suspended during the investigation, but on January 3, 2019, Lindhoff received a final warning.  The warning related, in part, to his Runzheimer submissions.[66]

_____

[66] Lindhoff's warning also referenced the text he sent Plaintiff telling Plaintiff to call a colleague a "fruity ass puss boy."  Defendants first became aware of that text during discovery.

## I.    Plaintiff's Post-Resignation Communication

After Plaintiff's resignation, Rowland contacted him to find out why he resigned. Plaintiff told Rowland he had suffered discrimination and had tried to leave the Lenexa Branch to no avail.  Plaintiff also requested an exit interview, and Rowland told him he would have Brett Glass, the Vice President of HR for Dr Pepper, contact him.  When Plaintiff spoke to Glass, he told Glass he had suffered discrimination and had previously met with Gray about it.  Glass asked Plaintiff to send him notes from that meeting.  Plaintiff complied, explaining that the notes represented a "little bit" of what he had gone through.[67]  After comparing Gray's notes from the prior investigation to the notes Glass took of his conversation with Plaintiff, Glass "didn't believe there was anything more to be done."[68]  Glass did not speak to any of the witnesses Plaintiff listed, nor did Glass conduct any further investigation beyond what Gray had completed.  Glass did not contact Plaintiff again.

## III.    Discussion

Plaintiff brings claims for hostile work environment, discrimination, and retaliation under Section 1981 and Title VII.  Defendants move for summary judgment on all claims and raise an affirmative defense as to all claims under *Faragher v. City of Boca Raton*[69] and *Burlington Industries, Inc. v. Ellerth*.[70]  The Court will address each of Plaintiff's claims in turn and then address Defendants' affirmative defense.

---

[67] Doc. 78-6 at 2.

[68] Doc. 78-5 at 45:18–20.

[69] 524 U.S. 775 (1998).

[70] 524 U.S. 742 (1998).

A.      **Hostile Work Environment Under Section 1981 and Title VII**

The same substantive standards apply to hostile work environment claims under Title VII and Section 1981.[71]  In order to survive summary judgment on a hostile work environment claim, a plaintiff must show that he was discriminated against because of his membership in a protected class, and that the discrimination was "sufficiently severe or pervasive such that it altered the terms or conditions of [his] employment and created an abusive working environment."[72]  A hostile work environment must be both objectively and subjectively offensive.[73]  To determine whether an environment is hostile, courts must consider all "circumstances including the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance."[74]

In addition, a plaintiff must be able to point to "more than a few isolated incidents of racial enmity."[75]  While the severity and pervasiveness inquiry "is particularly unsuited for summary judgment because it is quintessentially a question of fact,"[76] the Tenth Circuit has affirmed summary judgments granted partially based on the severity and pervasiveness

---

[71] *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1170 (10th Cir. 2018).  The Court notes that, although Plaintiff's response characterizes his hostile work environment claim as proceeding under Section 1981 without mention of Title VII (Doc. 78 at 64), the Pretrial Order includes a hostile work environment claim under both statutes.  Doc. 62 at 13.

[72] *Medina v. Income Support Div. of N.M.*, 413 F.3d 1131, 1134 (10th Cir. 2005).

[73] *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1219 (10th Cir. 2003); *Rogers v. City Cty. Health Dep't of Okla. Cty.*, 30 F. App'x. 883, 886 (10th Cir. 2002).

[74] *Stinnett*, 337 F.3d at 1219.

[75] *Lewis v. Standard Motor Prods., Inc.*, 203 F. Supp. 2d 1228, 1235 n.31 (D. Kan. 2002) (citing *Nieto v. Kapoor*, 268 F.3d 1208, 1220 (10th Cir. 2001) (citations omitted)).

[76] *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012).

requirement.[77]  "Mere snubs, unjust criticisms, and discourteous conduct are not actionable; to establish a hostile work environment, [a] plaintiff must show that the alleged harassment is excessive, opprobrious, and more than casual conversation."[78]

Defendants assert that the work environment was neither subjectively nor objectively hostile.  Most notably, Defendants argue that in March 2017—after more than three years of Lindhoff's alleged hostility—Plaintiff declined a job offer from RC Bottling, even though Plaintiff described that position as better than his job at Dr Pepper in terms of pay and benefits. Defendants note that most of the conduct Plaintiff cites in support of his hostile work environment claim occurred before Plaintiff declined the RC Bottling offer.  Thus, Defendants conclude, Plaintiff's own actions undermine his claim that his work environment was hostile because he opted to stay at Dr Pepper rather than accept an offer of better pay.

In determining whether Plaintiff was subjected to a hostile work environment, the Court considers both overtly discriminatory and facially-neutral comments and actions cited by Plaintiff.[79]  Plaintiff identifies multiple comments explicitly related to his race, religion, or national origin as well as additional facially-neutral comments Lindhoff made over a four-year period.[80]  The Court also considers other racially-motivated comments Lindhoff made during the relevant period, including introducing an African-American employee as "Coffee Black," telling a Middle-Eastern employee that he hoped he did not get caught up in T.S.A. while travelling,

---

[77] *See, e.g.*, *Morris v. City of Colo. Springs*, 666 F.3d 654, 665–66 (10th Cir. 2012); *Faragalla v. Douglas Cty. Sch. Dist.*, 411 F. App'x 140, 153–54 (10th Cir. 2011); *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 F. App'x 914, 921–26 (10th Cir. 2009).

[78] *Stewart v. Bd. of Comm'rs for Shawnee Cty., Kan.*, 216 F. Supp. 2d 1265, 1280 (D. Kan. 2002) (citing *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 561–62 (D. Kan. 1995)).

[79] *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 960 (10th Cir. 2012).

[80] "[F]acially neutral abusive conduct can support a finding of racial animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly discriminatory conduct." *Hernandez*, 684 F.3d at 960.

referring to Dr Pepper as the "black guys of the beverage industry" when he was upset with the company's performance, and commenting that he expected Plaintiff's Muslim wife to be wearing a "rag" on her head at a company event.

Plaintiff has submitted evidence of several first-hand incidents of harassment, including that Lindhoff: (1) made disparaging remarks about Plaintiff's religion, such as asking Plaintiff if he was going to sacrifice goats over the weekend and calling Muslims "weird" for fasting during Ramadan, (2) treated Plaintiff rudely during a company event at a Royals game by commenting "Is this only your 12 kids or you got more?" when Plaintiff's four children arrived, remarking that he believed Plaintiff's Muslim wife would have a "rag" on her head, and ignoring Plaintiff and his family throughout the event, (3) criticized Plaintiff's English-language abilities even though none of Plaintiff's coworkers reported difficulty understanding him, (4) asked Plaintiff what Middle Eastern shooters had been thinking following an attack in San Bernardino, California, (5) criticized employees who responded to Plaintiff's Happy Holidays email because Muslims do not celebrate "our holidays," (6) told Plaintiff he needed to learn about America before wishing Lindhoff a Happy Fourth of July, (7) told Plaintiff he should not return from vacation until he shaved his beard even though Dr Pepper did not have a policy against facial hair, (8) asked Plaintiff to resolve a dispute between a Pakistani Dr Pepper employee and an Indian customer even though such conflict resolution was not part of Plaintiff's job, and (9) commenting that Plaintiff and Lindhoff's doctor looked alike because they were both Middle Eastern.

Plaintiff also presented evidence of facially-neutral conduct that he believes was motivated by Lindhoff's racial or religious animus. For instance, Lindhoff asked Plaintiff to do personal tasks with and for him, such as chasing after Lindhoff's dogs, helping Lindhoff shop for

a coffee machine for his wife, and dropping off Lindhoff's laundry. Lindhoff also did not respect Plaintiff's requests to be called either "Mohammed" or "Mo," often calling him "Mo Mo" which Plaintiff testified he found demeaning. Although Defendants contend that Lindhoff used nicknames with many coworkers, Defendants do not allege that those coworkers asked Lindhoff not to use their respective nicknames. Plaintiff also asserts Lindhoff contacted him more frequently than other District Managers outside of regular business hours, and that Lindhoff contacted him much later at night than he contacted other District Managers. Plaintiff also notes that Lindhoff made jokes about Plaintiff frequenting the casino and dating an administrative assistant, even though Plaintiff had requested Lindhoff not make such comments.

Plaintiff complained to HR about Lindhoff's conduct three times; twice during his employment and once following his resignation. Although in the first two instances HR employees spoke with Lindhoff, no further investigation was conducted; none of the witnesses Plaintiff identified were interviewed. Even after Plaintiff resigned, Glass did not conduct any additional investigation and again failed to interview any of the witnesses Plaintiff identified.

Seeing that HR would not remedy the situation, Plaintiff applied for multiple jobs outside of Lindhoff's supervision but was not selected for these positions. To increase his odds of receiving a promotion, Plaintiff applied for the BLD Program but was not selected to participate. In each of these instances, decision-makers would have spoken with Lindhoff about Plaintiff's applications. There is no evidence in the record regarding what, if anything, Lindhoff told upper management during these conversations, though Lindhoff testified he does not recall making any negative comments about Plaintiff. Lindhoff did, however, tell Plaintiff that he would not be going anywhere within Dr Pepper without his approval after finding out Plaintiff had spoken with Rowland about a transfer or promotion.

Considering the totality of Lindhoff's conduct, the Court finds that a rational jury could determine that the alleged harassment was so severe and pervasive that it amounted to a hostile work environment. Viewing the evidence in the light most favorable to Plaintiff, as the Court must at the summary judgment stage, Plaintiff has established a genuine issue of material fact as to the pervasiveness and severity of the racially-charged and religiously-charged hostility in his work environment sufficient to have a jury decide the issue. Summary judgment is accordingly denied as to Plaintiff's hostile work environment claim.

**B.      Discrimination Under Section 1981 and Title VII**

Plaintiff next alleges that Defendants engaged in discrimination in violation of Section 1981 and Title VII. Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[81] Section 1981 "prohibits racial discrimination in the making and enforcement of private contracts."[82] The elements of a plaintiff's discrimination claim are the same regardless whether the claim is brought under Title VII or Section 1981.[83] Where, as here, a plaintiff relies on circumstantial evidence to prove discrimination, courts apply the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* and its progeny.[84] The Tenth Circuit has described that framework as follows:

> *McDonnell Douglas* first requires the aggrieved employee to
> establish a prima facie case of prohibited employment action . . . .
> If the employee makes a prima facie showing, the burden shifts to

---

[81] 42 U.S.C. § 2000e–2(a)(1).

[82] *Runyon v. McCrary*, 427 U.S. 160, 168 (1976) (citing 42 U.S.C. § 1981(a)).

[83] *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991) (citing *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285–86 (4th Cir. 1985))

[84] *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–07 (1973)).

the defendant employer to state a legitimate, "nondiscriminatory reason" for its adverse employment action. If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual.[85]

To establish a prima facie case of discrimination under Title VII and Section 1981, a plaintiff must show: (1) the plaintiff belongs to a protected class, (2) the plaintiff suffered an adverse employment action, and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.[86] The parties do not dispute that Plaintiff belongs to a protected class. Defendants move for summary judgment on the second and third elements of the prima facie case, arguing that Plaintiff did not suffer an adverse employment action under circumstances giving rise to an inference of discrimination. Even if Plaintiff has met his prima facie burden, Defendants contend that the actions were taken for legitimate reasons and Plaintiff cannot demonstrate pretext.

### 1. Prima Facie Case — Adverse Employment Actions

An employer's conduct rises to the level of an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[87] Said differently, an adverse employment action is one that results in "a significant change in employment status."[88] The Tenth Circuit "liberally defines the phrase 'adverse employment action'" and uses "'a case-by-case approach,' examining the unique factors

---

[85] *Id.* (citations omitted); *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1226 (10th Cir. 2000).

[86] *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

[87] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

[88] *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 934 (10th Cir. 2001).

relevant to the situation at hand."[89]  Adverse employment actions are not limited to monetary losses; rather, adverse employment actions can include acts that "carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects."[90] Plaintiff identifies the following adverse employment actions pertaining to his discrimination claim: (1) non-selection for the BLD Program, (2) suspension without pay, and (3) constructive discharge.

### a) Non-Selection for the BLD Program

Plaintiff has met his light burden of producing evidence that the non-selection for the BLD Program constituted an adverse employment action.  Plaintiff submits evidence that employees who had completed leadership programs, including the BLD Program, were given preferential treatment in hiring decisions and that the BLD Program was brought to Plaintiff's attention to increase the likelihood that he would be promoted in the future.  Non-selection for the BLD Program is therefore an adverse employment action under the Tenth Circuit's liberal definition.

### b) Suspension Without Pay

Defendants concede that suspension without pay *could* constitute an adverse employment action but argue that Plaintiff's suspension never took effect because he resigned.  Where a suspension is announced but not served, an employee has not suffered an adverse employment action.[91]  It is uncontroverted that Plaintiff did not serve his suspension.  Accordingly, Plaintiff's suspension without pay is not an independently actionable adverse employment action.

---

[89] *Couture v. Belle Bonfils Mem'l Blood Ctr.*, 151 F. App'x 685, 689–90 (10th Cir. 2005) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (citations omitted)).

[90] *Braxton v. Nortek Air Solutions, LLC*, 769 F. App'x 600, 604 (10th Cir. 2019).

[91] *See, e.g.*, *Candelaria v. Potter*, 132 F. App'x 225 (10th Cir. 2005) (finding a fourteen-day suspension did not constitute an adverse employment action because the employee did not serve the suspension).

### c) Constructive Discharge

Plaintiff argues that his constructive discharge constituted an adverse employment action. Defendants argue that Plaintiff has not met his burden of showing that he was, in fact, constructively discharged under the circumstances of his resignation. Defendants argue that Plaintiff has demonstrated that resigning was preferable, but not that resignation was Plaintiff's only option under the circumstances. For instance, Defendants cite to Plaintiff's declination of the RC Bottling job as evidence that Plaintiff's circumstances were not such that he had no other choice but to resign. In support of his constructive discharge claim, Plaintiff cites to many facets of his employment, including Lindhoff's harassment and discrimination, HR's failure to intervene despite two separate complaints Plaintiff lodged about Lindhoff's behavior, HR's failure to further investigate even after Plaintiff was constructively discharged, Plaintiff's repeated attempts to be promoted or transferred without success, Plaintiff being accused of and investigated for fraud, and Plaintiff being placed on suspension without pay so that Defendants could review mileage submissions of Plaintiff's peers.

To establish constructive discharge, an employee must prove that his "employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."[92] A true constructive discharge equates to a formal discharge in the context of discrimination claims,[93] and termination of employment constitutes an adverse employment action.[94] A finding of constructive discharge depends on whether a reasonable person would view the working conditions as intolerable, not

---

[92] *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986).

[93] *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004).

[94] *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1206 (10th Cir. 2004)

upon the view of the plaintiff.[95]  Said differently, the conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant, as are the employer's subjective intent.[96]

"If an employee resigns of [his] own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."[97]  The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions.  Further, conduct which meets the definition of a "tangible employment action" or an "adverse employment action" is not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable.[98]

"The bar is quite high in such cases: a plaintiff must show [he] had no other choice but to quit."[99]  An employee cannot survive summary judgment merely by producing evidence that work conditions were difficult or unpleasant.[100]  Whether a plaintiff was constructively

---

[95] *Derr*, 796 F.2d at 344.

[96] *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 534 (10th Cir. 1998); *Yearous v. Niobrara Cty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997); *see also Derr*, 796 F.2d at 344 (expressly adopting objective standard under which neither the subjective view of the plaintiff nor the subjective intent of the employer is relevant); *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007) (quoting *Tran v. Tr. of State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004)) ("[W]e apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent . . . are relevant."); *Keller v. Crown Cork & Seal USA, Inc.*, 491 F. App'x 908, 915 (10th Cir. 2012).

[97] *Jeffries v. Kansas*, 147 F.3d 1220, 1233 (10th Cir. 1998), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

[98] *Tran*, 355 F.3d at 1270–71.

[99] *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002); *see also Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004) (citing *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000); *Yearous*, 128 F.3d at 1357) ("Working conditions must be so severe that the plaintiff simply had no choice but to quit.").

[100] *Fischer v. Forestwood Co.*, 525 F.3d 972, 981 (10th Cir. 2008); *Potts v. Davis Cty.*, 551 F.3d 1188, 1194 (10th Cir. 2009) (emphasizing that a constructive discharge only occurs where working conditions were intolerable, not merely unpleasant); *DeWalt v. Meredith Corp.*, 288 F. App'x 484, 494 (10th Cir. 2008) ("'The

discharged is a question of fact, and judgment as a matter of law is only appropriate if the evidence is susceptible to but one interpretation.[101]

Here, Plaintiff argues that, over nearly a four-year period: (1) Lindhoff harassed and discriminated against him, (2) HR failed to investigate either of his complaints about Lindhoff's behavior, (3) despite two complaints to HR and an oral warning from HR, Lindhoff's behavior toward Plaintiff did not improve, (4) Plaintiff repeatedly attempted to be transferred or promoted to no avail, (5) Plaintiff was unfairly subjected to a fraud investigation, and (6) Plaintiff was unfairly disciplined following the investigation. On these bases, Plaintiff alleges he had no other choice but to resign.

Viewing the summary judgment record in the light most favorable to Plaintiff, Plaintiff presents sufficient evidence to survive summary judgment on his constructive discharge claim. Shortly after Lindhoff became Plaintiff's supervisor, Plaintiff complained about how Lindhoff treated Plaintiff differently than others. Zuniga, the HR employee with whom Plaintiff spoke, did not follow up with Plaintiff regarding the issue. Instead, Plaintiff was confronted by Lindhoff who asked Plaintiff whether he thought going to HR would do anything to Lindhoff and told Plaintiff to speak with him before going to HR in the future. Lindhoff's harassment and discriminatory conduct continued unabated following Plaintiff's meeting with Zuniga. When Plaintiff complained to HR a second time, Lindhoff was merely interviewed and orally coached about correcting his behavior toward employees. None of the witnesses Plaintiff identified were interviewed. Lindhoff was not formally disciplined, and no record of the meeting between Lindhoff and Gray was placed in Lindhoff's personnel file. That Lindhoff's conduct did not

---

question is not whether working conditions . . . were difficult or unpleasant,' but rather whether the plaintiff's decision to resign can properly be characterized as involuntary.") (quoting *Exum*, 389 F.3d at 1135)).

[101] *Keller*, 491 F. App'x at 915.

improve after Plaintiff's second complaint to HR suggests that HR's oral coaching or warning did not impress upon Lindhoff the seriousness of his conduct.

Having received no reprieve from HR, Plaintiff applied for at least six positions in Dr Pepper's other branches in an attempt to be transferred away from Lindhoff. When Plaintiff inquired about why he had not received these positions, he was told he was a strong candidate, but unable to be hired for those positions. Plaintiff spoke to three people—Smith, Brennan, and Wilcox—about his desire to transfer and asked about what he could do to improve his chances. Plaintiff was instructed to participate in a development plan with Lindhoff. Lindhoff, T. Johnson, and Roberts created a development plan and scheduled weekly meetings to discuss Plaintiff's progress. The development plan included classes Plaintiff could take and a training book for Plaintiff to read. Plaintiff had already completed all the recommended classes and read most, though not all, of the training book. Plaintiff did not believe that the development plan was taken seriously in part because Lindhoff, T. Johnson, and Roberts did not all regularly attend the weekly meetings. Plaintiff also repeatedly asked upper management about the BLD Program, a training program that would greatly improve his chances of being promoted at Dr Pepper. Though informed he was a strong candidate, Plaintiff was not selected for the BLD Program. During the time he was applying for other jobs within Dr Pepper, Lindhoff warned Plaintiff he would not be going anywhere without Lindhoff's approval.

Finally, Plaintiff was accused of fraud, investigated, and placed on suspension without pay. Plaintiff did not recall, and Defendants did not name, any other employee under Lindhoff's supervision who had been investigated for their mileage submissions. Even though Roberts posed the question of Plaintiff's whereabouts related to a specific account, it was Lindhoff who introduced the possibility of a fraud investigation. At the conclusion of the investigation,

Plaintiff was told he was being suspended without pay but not told how long the suspension without pay would last. Defendants wanted an opportunity to compare Plaintiff's improper mileage submissions to the mileage submissions of other District Managers before making a final determination. Plaintiff was not told whether this process would take days, weeks, or months. Although Lindhoff, LeRoy, and T. Johnson stated that they would be conducting investigations of the other District Managers supervised by Lindhoff, those managers' mileage reports were simply "reviewed," and no formal investigation occurred.

Taken together and viewed in the light most favorable to Plaintiff, a rational jury could determine that Plaintiff had no other choice but to quit when he orally resigned on November 27, 2017. Accordingly, Plaintiff has established a genuine issue of material fact about whether he was constructively discharged, which is an adverse employment action for purposes of Plaintiff's discrimination claim.

### 2. Defendants' Legitimate, Non-Discriminatory Reasons

Defendants provide a legitimate, non-discriminatory reason for each adverse employment action Plaintiff cites. Defendants explain that Plaintiff was not selected for the BLD Program because the program is highly competitive, only taking three to five candidates per year, and that more-qualified individuals applied. Rowland, who selected the participants, testified that he would not have selected Plaintiff over those who were selected.

Defendants have also articulated legitimate reasons for many of the components of Plaintiff's constructive discharge claim. They explain that Roberts had concern about Plaintiff's whereabouts, which led Lindhoff to review Plaintiff's mileage reports. During this review, Lindhoff determined that further investigation was warranted based on addresses that Lindhoff did not believe had legitimate business purposes. Defendants explain that Plaintiff was

suspended without pay because Plaintiff's mileage reports contained multiple illegitimate submissions and Defendants needed additional time to review mileage reports of other District Managers before determining the outcome of Plaintiff's investigation.

### 3. Pretext

Once a plaintiff has established a prima facie case of discrimination and the defendant has articulated a legitimate, non-discriminatory reason for its actions, the plaintiff must demonstrate a genuine issue of material fact as to whether defendant's explanations are pretext for unlawful discrimination. A plaintiff can demonstrate pretext by showing "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[102] Mere conjecture is not enough; a plaintiff must "cast doubt" on the employer's explanations by specifically pointed out these "implausibilities, incoherencies, or contradictions."[103]

Typically, a plaintiff attempts to demonstrate pretext in one or more of the following three ways:

> (1) With evidence that the defendant's stated reason for the adverse employment action was false, (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.[104]

---

[102] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

[103] *Id.* at 1323–25.

[104] *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

Other evidence of pretext may include prior treatment of the plaintiff and the use of subjective criteria in decisions that impact the plaintiff.[105]

### a) Non-Selection for the BLD Program

As previously noted, Plaintiff has met his burden to show a prima facie case of discrimination based on his non-selection for the BLD Program, and Defendants have met their burden of articulating a legitimate, non-discriminatory reason for these actions. The Court next considers whether Plaintiff has introduced sufficient evidence of pretext to survive summary judgment.

Plaintiff argues that Defendants' explanation is pretextual because of Lindhoff's "track record of harassing" Plaintiff and that pretext can be inferred from Lindhoff's discriminatory animus.[106] Plaintiff also argues Defendants' proffered reasons were pretextual because Lindhoff told Plaintiff he would not be able to go anywhere without Lindhoff's approval.[107] This evidence does not raise a genuine issue of material fact regarding whether Defendants' stated reason—that the leadership program was highly competitive and more qualified applicants applied—was pretextual.

Lindhoff testified that he submitted Plaintiff's name for consideration in the program, a fact that is not disputed. Rowland, who chose participants for the leadership program, testified that he would not have selected Plaintiff over those he ultimately selected, though he could not recall whether Plaintiff's name was submitted to him in a given year. In the email informing Plaintiff he had not been selected, Plaintiff was informed he had been discussed as a strong

---

[105] *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005).

[106] Doc. 78 at 62.

[107] Plaintiff also argues pretext on the basis that Rowland did not receive Plaintiff's name for consideration in the leadership program. However, Rowland simply testified that he could not remember whether Plaintiff's name had been submitted to him for consideration in a particular year.

candidate for the leadership program in future years. It is undisputed that Rowland, not Lindhoff, made the decision about admissions into the leadership program and that Rowland would not have selected Plaintiff over those he did choose. It is also undisputed that Plaintiff has not accused Rowland of exhibiting discriminatory animus toward him. Accordingly, because Plaintiff has not raised a genuine issue of material fact regarding whether Defendants' reasons for selecting other candidates for the BLD Program were pretextual, Defendants are entitled to summary judgment on this claim.

### b) Constructive Discharge

Defendants have met their burden of articulating legitimate, non-discriminatory reasons for their actions that comprise Plaintiff's constructive discharge. The burden then shifts to Plaintiff to demonstrate Defendants' reasons were pretextual. In support of his argument that Defendants' reasoning is pretext for discrimination, Plaintiff relies on: (1) inconsistencies in Defendants' stories about how the fraud investigation started, (2) HR's inadequate investigations into Plaintiff's complaints about Lindhoff's behavior, (3) LeRoy's testimony that the investigation raised "some concerns, but not quite the volume [LeRoy] was expecting" based on the referral from T. Johnson and Lindhoff, (4) LeRoy's testimony that submitting mileage for lunch and personal errands within an employee's territory was "not generally a problem," (5) Lindhoff's failure to provide LeRoy with an accurate map of all of Plaintiff's territory during the investigation, (6) the lack of clarity regarding whether certain mileage could be submitted for reimbursement, (7) the decision to place Plaintiff on suspension without pay, (8) the failure to conduct investigations of other District Managers after Plaintiff's termination, and (9) Lindhoff's history of harassing Plaintiff coupled with Lindhoff's connection to the decision-making process.

The first two arguments Plaintiff makes do not provide a basis on which a could infer pretext. First, the explanations of how the fraud investigation started are not actually inconsistent. Lindhoff's explanation simply contained additional detail about how he realized he could review Plaintiff's Runzheimer submissions. Second, Plaintiff's suggestion that the HR investigations into Lindhoff were inadequate does not demonstrate that the reasons for investigating Plaintiff and suspending him without pay were pretext for discrimination. Plaintiff does not accuse anyone other than Lindhoff of discrimination or harassment, and he has not shown that Lindhoff was involved with HR beyond speaking to Gray on one occasion in response to Plaintiff's discrimination allegations. Moreover, the case that Plaintiff cites in support of this argument refers to inadequate investigations of the plaintiff-employee, not inadequate investigations into allegedly discriminatory conduct.[108]

However, the remainder of Plaintiff's arguments do provide a basis on which a rational jury could infer pretext. LeRoy testified that, based on how the information about Plaintiff's alleged fraud was presented to him, he expected that the fraud would have been more voluminous. On this basis, one could infer that Lindhoff had exaggerated his own concerns in order to trump up the investigation and paint Plaintiff in a worse light than was warranted. LeRoy also testified that submitting mileage reimbursement for lunch trips and personal errands within an employee's territory was "not generally a problem." Defendants emphasize that many employees only testified about submitting lunch mileage for reimbursement and did not comment on personal errands within their territory. However, this raises an issue of fact about whether personal errands within an employee's route to-and-from a customer *needed* to be

---

[108] *See, e.g.*, *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (holding that "[a]n employer's purported reason may also be undermined by evidence the company failed to adequately investigate the offense *for which it purportedly fired* the plaintiff") (emphasis added)).

omitted from a mileage report.  Plaintiff contends that the mileage which Defendants say caused concern were all personal errands or lunch trips within his territory, other than the trips to Amazon which he characterized as mistakenly included on his mileage report.

Lindhoff's failure to provide LeRoy with complete, accurate information at the start of the investigation also could raise an inference of pretext.  Lindhoff emailed LeRoy a map of Plaintiff's territory, but the map did not reflect *all* of Plaintiff's territory.  Although LeRoy testified that he did not rely solely on territory maps during his investigation, Defendants do not provide any explanation for Lindhoff's failure to provide a complete map of Plaintiff's territory. Moreover, Lindhoff did not affirmatively provide information to LeRoy about Plaintiff assisting other District Managers or Plaintiff's work on Saturdays.  Instead, Lindhoff waited until LeRoy posed these questions, to which Lindhoff responded that certain questionable mileage had been legitimate.

The record also establishes that Defendants' policy regarding what mileage to submit for reimbursement was confusing, and that employees had not received extensive training about the process.  For instance, there was conflicting information about whether commute miles should be submitted for reimbursement.  Multiple employees testified that lunch miles were reimbursable so long as the employee had not driven significantly outside of his/her territory for lunch.  LeRoy testified that even mileage for personal errands, so long as they were within an employee's territory, were generally not a problem.  Defendants' proffered reason for investigating Plaintiff's mileage reports were stops at businesses or locations that did not appear to have a business purpose.  However, such stops are not necessarily in violation of Dr Pepper's mileage reimbursement policy according to the testimony of the very person responsible for fraud investigations at Dr Pepper.  At the very least, Plaintiff has articulated a basis on which he

believed those miles were legitimately reimbursable. Plaintiff did admit that the four stops to another employer were not legitimately reimbursable but has consistently maintained that those submissions were mistakes.

Additionally, Defendants' decision to conduct reviews of other District Managers' mileage reports before deciding how (and whether) to discipline Plaintiff bolsters Plaintiff's argument that the policy was unclear. Lindhoff, T. Johnson, and LeRoy's decision to investigate other District Managers to compare their mileage reports to Plaintiff's reveals that even Defendants' management was unsure how employees were instructed to use the application. If the policy had been clear, there would not have been a need to compare other District Managers' mileage reports to Plaintiff's before determining how to proceed.

Plaintiff also argues that the decision to place him on suspension without pay provides a basis on which a rational jury could infer pretext. Defendants say they wanted an opportunity to review other District Managers' mileage reports and compare them to Plaintiff's reports before reaching a final decision in Plaintiff's investigation. Plaintiff was not informed how long the suspension without pay would last, nor is there any explanation for why the parallel investigation into the other District Managers required placing Plaintiff on suspension without pay. Adding to Plaintiff's pretext argument, neither of the other District Managers under Lindhoff's supervision, S. Johnson and Rouchka, were actually investigated or placed on suspension without pay. Instead, a member of LeRoy's department reviewed their mileage reports and determined no additional action was necessary. However, both S. Johnson and Rouchka admitted during their depositions that they had likely made mistakes on their mileage submissions—just as Plaintiff had when he submitted reports that included trips to and from Amazon.

The investigation into Plaintiff's submissions ultimately revealed a loss of $62.00. Defendants provide no explanation why such a small error—intentional or not—would justify an indefinite suspension without pay. Moreover, Lindhoff was part of the decision-making process. Although it is unclear what role he played in the decision to suspend Plaintiff, the record reflects that he was involved at some level.

In addition, Plaintiff argues that pretext may be inferred from Lindhoff's discriminatory animus toward him. Defendants have no response to this argument, other than to insist Lindhoff took actions that benefitted Plaintiff during Plaintiff's employment, such as authoring positive performance reviews. Defendants also reiterate that Lindhoff's conduct was not severe enough to constitute discriminatory animus. Both of Defendants' arguments raise factual questions for a jury which preclude summary judgment. While it is true that a jury may reach the same conclusions as Defendants, a rational jury may also determine that Lindhoff gave Plaintiff positive reviews so that there was no paper trail of his discriminatory animus. Similarly, as discussed at length regarding Plaintiff's hostile work environment claim, a rational jury could conclude that Lindhoff's actions constitute racially or religiously-motivated hostility toward Plaintiff.

Plaintiff has introduced a genuine issue of material fact regarding whether Defendants' proffered reasons for the investigation and Plaintiff's subsequent discharge were pretextual based on: (1) LeRoy's expectations—set by T. Johnson and Lindhoff's referral—that the investigation would reveal more voluminous instances of fraud, (2) LeRoy's testimony that mileage for lunch trips and personal errands within an employee's territory were not generally a problem, (3) inconsistency and uncertainty regarding Dr Pepper's mileage reimbursement policy, (4) Lindhoff's failure to provide LeRoy with a complete, accurate information at the start of the

investigation and his failure to *ever* provide LeRoy a complete map of Plaintiff's territory, (5) the decision to suspend Plaintiff without pay for an unspecified amount of time prior to calculating the total monetary loss, (6) the mere "review" of other District Managers' mileage without further investigation, notwithstanding their testimony that they had mistakenly submitted some personal mileage, and (7) Lindhoff's discriminatory animus toward Plaintiff, particularly when coupled with his role in the decision-making process. In sum, Plaintiff has produced sufficient evidence of pretext to survive summary judgment on his discrimination claim as it relates to his constructive discharge.

### C.     Retaliation Under Section 1981 and Title VII

Plaintiff alleges that he was the victim of retaliation under Title VII and Section 1981 because of the complaints he made against Lindhoff to Zuniga in 2014 and Gray in 2016. Plaintiff asserts he was retaliated against in the following instances: (1) when Plaintiff was not selected to participate in the BLD Program, (2) when Plaintiff was accused of and investigated for fraud, (3) when Plaintiff was placed on suspension without pay, and (4) when Lindhoff treated him in a "more harassing" manner. The Court will first address Plaintiff's non-selection for the BLD Program. Next, the Court will address the fraud accusation, fraud investigation, and suspension together. Finally, the Court will consider Plaintiff's claim that Lindhoff engaged in retaliatory harassment.

#### 1.     Non-Selection for the BLD Program

Plaintiff argues that his non-selection for the BLD Program was retaliatory.[109] In their motion for summary judgment, Defendants assert that "[b]ased on the language in the Pretrial Order, it appears Plaintiff cites" his non-selection as a one of the "factors that led to his alleged

---

[109] Doc. 62 at 13.

constructive discharge, rather than separately actionable events."[110]  Defendants then state that

"Plaintiff's counsel confirmed this" specifically as to the non-selection for the BLD Program.[111]

Defendants do not cite to any such confirmation, nor do they explicitly move for summary

judgment on this claim.  Because of Defendants' failures, they are not entitled to summary

judgment.  Plaintiff's claim for retaliation based on his non-selection for the BLD Program

therefore survives.

### 2.  Fraud Accusation, Investigation, and Resulting Suspension Without Pay

The requirements to establish claims for retaliation are identical under Section 1981 and

Title VII.[112]  Those statutes make it unlawful to retaliate against an employee because the

employee has opposed any practice made unlawful by Title VII or Section 1981.  In the absence

of direct evidence of retaliation, courts assess retaliation claims under the *McDonnell Douglas*

burden-shifting framework.[113]  Under *McDonnell Douglas*, the plaintiff initially bears the burden

of production to establish a prima facie case of retaliation.[114]  If the plaintiff establishes a prima

facie case, the burden shifts to the defendant to articulate a facially non-retaliatory reason for its

actions.[115]  The burden then shifts back to the plaintiff to present evidence from which a jury

---

[110] Doc. 70 at 47.

[111] *Id.*

[112] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011).

[113] 411 U.S. 792, 802–04 (1973).  In 2013, the Supreme Court considered the causation standard that applies to Title VII retaliation claims and held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m).  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  This decision, however, did not alter the continued application of *McDonnell Douglas* to Title VII retaliation claims at the summary judgment stage.  *See Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278–79 (10th Cir. 2010) (holding that *Nassar*'s predecessor *Gross* did not overrule application of the *McDonnell Douglas* burden-shifting framework to ADEA cases); *Moore-Stovall v. Shinseki*, 969 F. Supp. 2d 1309, 1321 n.15 (D. Kan. 2013) (explaining that *Nassar* does not alter the burden-shifting framework at the summary judgment stage of a retaliation claim).

[114] *McDonnell Douglas*, 411 U.S. at 802.

[115] *Id.*; *Timmerman v. U.S. Bank*, 483 F.3d 1106, 1113 (10th Cir. 2007).

might conclude that the defendant's proffered reason is pretextual—that is, "unworthy of belief."[116]  Here, Plaintiff must first establish a prima facie case of retaliation; if he does, the burden then shifts to Defendants to establish some legitimate, non-discriminatory reason for the employment action; the burden then returns to Plaintiff to show Defendants' proffered reasons are actually pretext for retaliation under either Title VII or Section 1981.

The elements of a prima facie case for retaliation under both Title VII and Section 1981 are: (1) the employee engaged in protected opposition to discrimination, (2) the employee suffered an adverse action during or after the protected opposition that a reasonable employee would have found materially adverse, and (3) a causal connection exists between the protected activity and the materially adverse action.[117]  Defendants do not contest that Plaintiff engaged in protected activity when he complained to Zuniga in 2014 and again to Gray in 2016 about Lindhoff's behavior.  Defendants challenge Plaintiff's retaliation claim on the second and third elements.  Defendants also argue that, even if Plaintiff were able to establish a prima facie case, he has failed to provide evidence that Defendants' legitimate, non-retaliatory reasons for each action were pretextual.

### a) Materially Adverse Action

The "materially adverse action" element of a retaliation claim is more lenient than the "adverse employment action" element of other Title VII claims.[118]  In the context of a retaliation claim, Title VII and Section 1981 prohibit employers from taking "materially adverse" action

---

[116] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[117] *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201–02 (10th Cir. 2008); *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[118] *See Piercy v. Maketa*, 480 F.3d 1192, 1203 n.12 (10th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

against an employee because the employee opposed conduct that Title VII or Section 1981 forbids, or the employee otherwise engaged in protected activity.[119]  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[120]  Courts examine claims of adverse action through a "case-by-case approach, examining the unique factors relevant to the situation at hand."[121]  Whether the claimed adverse action is material is determined objectively; "petty slights, minor annoyances, and simple lack of good manners" will not deter "a reasonable worker from making or supporting a charge of discrimination."[122]  The Tenth Circuit has emphasized that deciding whether an employer's actions are "materially adverse" is a case-specific exercise that requires an objective inquiry that does not turn on a plaintiff's personal feelings.[123]  In making a decision, courts must consider the "constellation of surrounding circumstances, expectations, and relationships."[124]

Being accused of fraud and being the subject of a fraud investigation are materially adverse employment actions.  Plaintiff's suspension without pay, if served, would also constitute a materially adverse action.  As discussed above, a suspension that is announced but not served does not qualify as an adverse employment action for purposes of a discrimination claim.  However, in recognition that the Tenth Circuit liberally construes materially adverse

---

[119] *Burlington*, 548 U.S. at 63 (2006).

[120] *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1266 (10th Cir. 2009) (quoting *Burlington*, 548 U.S. at 67–68).

[121] *McGowan*, 472 F.3d at 742.

[122] *Id.* (quoting *Burlington*, 548 U.S. at 68).

[123] *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184–85 (10th Cir. 2009).

[124] *Barone v. United Airlines, Inc.*, 355 F. App'x 169, 183 (10th Cir. 2009) (quoting *Burlington*, 548 U.S. at 69).

employment actions, and in recognition that a Plaintiff's burden at the prima facie stage is not onerous, the Court finds that the announcement of Plaintiff's suspension without pay does constitute a materially adverse employment action because such discipline could reasonably deter an employee from making a charge of discrimination.

### b) Defendants' Legitimate, Non-Retaliatory Reasons

Defendants explain that Plaintiff was accused of fraud based on a visit Roberts took to one of Plaintiff's accounts. Upon seeing a company display that fell short of company standards, Roberts remarked that Plaintiff did not seem to be spending time at that account and inquired about where Plaintiff did spend his time. Later, Lindhoff reviewed Plaintiff's mileage submissions from Runzheimer and noticed multiple stops at residential addresses on a frequent basis. Lindhoff then discussed his concerns with T. Johnson, and the investigation was referred to LeRoy. LeRoy testified that when there are issues or concerns about an employee possibly committing fraud, his department investigates those claims. Such investigations are part of LeRoy's routine job duties. LeRoy conducted the investigation in accordance with his standard procedure. Defendants have also explained that Plaintiff was suspended without pay because they wanted an opportunity to review other District Managers' mileage submissions before determining how to proceed with Plaintiff. Accordingly, Defendants have met their burden of articulating legitimate, non-retaliatory reasons for why Plaintiff was accused of fraud, investigated for fraud, and suspended without pay.

### c) Causal Connection and Pretext

An employee claiming retaliation must demonstrate a causal connection between the protected activity and the adverse action. The Tenth Circuit has found a causal connection exists between an employee's protected activity and a materially adverse action "where the plaintiff

presents evidence of circumstances that justify an inference of retaliatory motive."[125]  Courts

typically consider "protected conduct *closely followed by* an adverse action" as sufficient

evidence.[126]  However, when enough time elapses between the protected conduct and the adverse

action, a court requires "additional evidence beyond temporal proximity to establish

causation."[127]

When analyzing the additional evidence, courts can consider all the proffered evidence of

retaliatory motive, which includes pretext evidence.[128]  "In order to make a prima facie case, one

must only introduce evidence from which an inference can be drawn that an employer would not

have taken the adverse action had the employee not filed prior discrimination charges."[129]

Ultimately, the burden of establishing a prima facie case is not onerous, but "[t]o defeat a motion

for summary judgment, evidence, including testimony, must be based on more than mere

speculation, conjecture, or surmise."[130]  The Supreme Court has clarified that Title VII plaintiffs

asserting retaliation claims must show that their protected activities were the but-for cause of the

alleged employment actions, and not merely a motivating factor.[131]

Here, Plaintiff engaged in protected activity approximately seventeen months before the

alleged retaliatory acts.  Consequently, to survive summary judgment, he must cite to "something

---

[125] *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).

[126] *Id.*

[127] *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *see e.g., Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding one and one-half months establishes causation while three months is too long and does not).

[128] *Xia v. Salazar*, 503 F. App'x 577, 580 (10th Cir. 2012) (citing *Anderson*, 181 F.3d at 1179).

[129] *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[130] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (affirming grant of summary judgment to employer because "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings.").

[131] *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

more" to demonstrate a causal connection between his protected activities and the allegedly retaliatory acts. To do so, Plaintiff relies on the same pretext evidence cited for his discrimination claim and adds that after each complaint to HR, Lindhoff responded with hostility and threats. As the Court explained in the discussion of Plaintiff's discrimination claim, Plaintiff's pretext evidence provides a basis from which a reasonable jury could conclude Defendants' proffered reasons were mere pretext to mask Lindhoff's discriminatory animus. Lindhoff's threatening reactions to Plaintiff's complaints to HR are particularly important in the retaliation context. Immediately after Plaintiff spoke to HR the first time, Lindhoff confronted Plaintiff. Lindhoff warned that Plaintiff needed to speak with him prior to making any complaint to HR in the future. Later, when Plaintiff spoke to other members of management about wanted a job in another location, Lindhoff again threatened Plaintiff, stating that Plaintiff would not be able to go anywhere without Lindhoff's approval. Then when Plaintiff spoke to Gray in 2016, Lindhoff became increasingly dismissive of Plaintiff and refused to assist Plaintiff when he asked work-related questions. Defendants' only response to these claims is that Plaintiff's characterization of these comments as "threats" is unsupported by the record. Considering Lindhoff's demeanor, the circumstances including Lindhoff's history of treating Plaintiff poorly, and Plaintiff's testimony, these comments could easily be deemed "threats" by a rational fact-finder. Defendants' argument therefore does not entitle them to summary judgment. The pretext evidence, as described at length in the section on Plaintiff's discrimination claim, precludes summary judgment on Plaintiff's retaliation claim for the fraud accusation, fraud investigation, and related discipline.

### 3. Retaliatory Harassment

Plaintiff also contends that following his complaints to Zuniga and Gray, Lindhoff treated him in a more discriminatory, harassing manner. Plaintiff does not identify which acts of harassment or discrimination he believes were retaliatory, instead citing to the entirety of Lindhoff's actions to support his claim. Defendants argue that this does not constitute a materially adverse action because it did not cause sufficient harm to Plaintiff. According to Defendants, Lindhoff's treatment of Plaintiff could at most be considered the sort of "trivial harms, petty slights, minor annoyances, and simple lack of good manners" that the Tenth Circuit has deemed insufficient to support a retaliation claim.[132] Even assuming it were an adverse employment action, Defendants argue that Plaintiff has failed to show any causal connection between Lindhoff's harassment and Plaintiff's protected activity.

The Tenth Circuit has held that sufficiently severe or pervasive harassment of an employee, when viewed in the aggregate, may constitute a materially adverse employment action.[133] "To be actionable, the alleged retaliatory harassment must be objectively and subjectively offensive, and 'must rise to some level of substantiality.'"[134] In deciding whether conduct rises to the level of retaliatory harassment, courts consider the totality of the circumstances, including the severity and frequency of the harassment.[135]

As discussed at length in the section on Plaintiff's hostile work environment claim, Plaintiff has met his burden of establishing that a reasonable fact-finder could determine

---

[132] Doc. 70 at 48 (quoting *Johnson v. Weld Cty.*, 594 F.3d 1202, 1211 (10th Cir. 2010)).

[133] *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264–65 (10th Cir. 1998) (recognizing that sufficiently severe coworker hostility or retaliatory harassment may constitute an adverse employment action for a retaliation claim if management orchestrates or knowingly acquiesces in the harassment).

[134] *Lujan v. Johanns*, 181 F. App'x 735, 738 (10th Cir. 2006) (quoting *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005)).

[135] *Id.*

Lindhoff's conduct constituted a materially adverse action. In addition to Lindhoff's racially and religiously hostile comments toward and about Plaintiff, Plaintiff emphasizes that Lindhoff threatened him after each complaint he made to HR about Lindhoff's behavior. Defendants assert that these comments were not threats, but this sort of discrepancy in how to characterize Lindhoff's comments presents a factual question for the jury. Evaluating the totality of the circumstances, Plaintiff has met his burden of identifying Lindhoff's harassment as a materially adverse action for his retaliation claim.

Defendants do not offer a facially non-retaliatory reason for these actions. Defendants assert that Lindhoff's conduct does not rise to the level of a materially adverse employment action because a reasonable employee would not have been dissuaded from complaining to HR based on Lindhoff's conduct. This assertion, however, is belied by the record. Plaintiff explicitly told Gray that he was worried about Lindhoff retaliating against him if Lindhoff were too severely disciplined. Plaintiff's concern was based on the repeated threatening comments Lindhoff made to him, including Lindhoff's 2014 warning to Plaintiff that he needed to come to Lindhoff before going to HR and Lindhoff telling Plaintiff he would not be going anywhere without Lindhoff's approval following Plaintiff's application to other positions within Dr Pepper. Even if Defendants had articulated a legitimate, non-retaliatory reason for Lindhoff's conduct, Plaintiff has established sufficient pretext evidence to survive summary judgment. Defendants are therefore not entitled to summary judgment on any of Plaintiff's retaliation claims.

## D.    Affirmative Defense Under *Faragher/Ellerth* as to All Claims

Defendants raise the affirmative defense articulated in *Faragher v. City of Boca Raton*[136] and *Burlington Industries, Inc v. Ellerth*[137] as to each of Plaintiff's claims. Where, as here, a supervisor is accused of harassment or discrimination, the employer is vicariously liable for the supervisor's severe or pervasive harassment unless the employer can establish: "(a) that the employer exercised reasonable care to prevent and correctly promptly any [racially] harassing behavior, and (b) that the plaintiff-employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise."[138] The defendant-employer bears the burden to prove both prongs of this defense by a preponderance of the evidence.[139] Thus, the employer "must prove both that it *acted reasonably* in preventing and correcting harassment and that the victimized employee unreasonably *failed to act* by not utilizing complaint opportunities. The employer will lose this defense if it fails either prong."[140]

For summary judgment to be granted on the *Faragher/Ellerth* defense, the employer-defendant must "support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."[141] "The defendant must demonstrate that," when construing the evidence in the light most favorable to the plaintiff, "no disputed material fact exists

---

[136] 524 U.S. 775 (1998).

[137] 524 U.S. 742 (1998).

[138] *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009) (citations omitted).

[139] *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1228 (10th Cir. 2000) (citing *Faragher*, 524 U.S. at 807–08).

[140] *Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 746 (10th Cir. 2014) (quoting *Clark v. United Parcel Serv.*, 400 F.3d 341, 349 (6th Cir. 2005)).

[141] *Anderson v. Dep't of Health & Human Servs.*, 907 F.2d 936, 947 (10th Cir. 1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)).

regarding the affirmative defense asserted."[142]  Even where the facts regarding the

*Faragher/Ellerth* defense are undisputed, "the judgment call as to reasonableness is itself a jury

issue unless no reasonable jury could decide it in the plaintiff's favor."[143]  Defendants have not

supported their motion for summary judgment on this defense with evidence that would entitle

them to summary judgment.

The record contains reasonable inferences that weigh in Plaintiff's favor, precluding

summary judgment.  The first prong of *Faragher/Ellerth* requires Defendants to establish that

they took reasonable care to both prevent and promptly correct the alleged harassment.  Plaintiff

complained to Zuniga in 2014 that Lindhoff treated him weirdly or differently.  Lindhoff either

knew or had suspicions that Plaintiff had spoken to HR and confronted Plaintiff.  Lindhoff told

Plaintiff to speak to him before going to HR going forward, and asked Plaintiff if he believed

going to HR would "do anything" to Lindhoff.  Zuniga never followed up with Plaintiff, and no

corrective action was taken.

Plaintiff again complained to HR in 2016, this time explicitly stating he believed

Lindhoff was discriminating against him based on race, religion, and national origin.  Gray took

notes of his conversation with Plaintiff and interviewed Lindhoff about the exchanges Plaintiff

brought to his attention.  Even though Plaintiff and Lindhoff provided different accounts of the

events, and even though Plaintiff provided Gray with witnesses to many of the events, Gray did

not conduct further investigation.  Gray testified that he spoke to Lindhoff about his behavior and

told Lindhoff that he had not acted appropriately.  No other corrective action was taken, and no

record of Gray's conversation with Lindhoff appears in Lindhoff's personnel file.  Finally,

---

[142] *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011).

[143] *Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27, 34 (1st Cir. 2003).

Plaintiff spoke to Glass after his resignation. Yet again, HR did not take further action. None of the witnesses Plaintiff identified were ever contacted, and Glass did not determine any additional discipline against Lindhoff was warranted. These facts demonstrate, at the very least, a fact-issue for the jury regarding whether Defendants' failures to investigate following these complaints were "reasonable."

Even assuming Defendants met their burden on the first prong of *Faragher/Ellerth*, Defendants have not met their burden on the second prong. The second prong requires Defendants to prove that Plaintiff unreasonably failed to avoid or reduce harm. Here, Plaintiff complained twice to HR during his employment and attempted to resolve the issue by applying to positions where Lindhoff would not be his supervisor. The HR complaints did not resolve the issues, and Plaintiff did not receive any of the positions outside of Lindhoff's supervision. Although there is some evidence in the record to indicate that Plaintiff did not follow each step in an anti-discrimination policy Defendants provided him at the start of his employment, whether his failure to do so was unreasonable presents a fact question for the jury. For instance, the record shows that Plaintiff told Gray he was afraid that Lindhoff would retaliate against him for complaining about Lindhoff's harassment and discrimination. Whether this belief reasonably prevented Plaintiff from following Defendants' exact complaint procedures is a fact question that is not properly resolved on summary judgment. Accordingly, Defendants are not entitled to summary judgment based on the *Faragher/Ellerth* affirmative defense.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 69) is **granted in part and denied in part**. The motion is **granted** as to Plaintiff's discrimination claim for non-selection into the BLD Program and suspension without pay. The motion is **denied** as to all remaining claims.

**IT IS SO ORDERED.**

Dated: November 19, 2019

s/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE